IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

FILED _____ LODGED
_____ RECEIVED _____ COPY

JUL 26 2016

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

ANDREA B. TWITCHELL,

    Plaintiff,

v.

ALLIED PILOTS ASSOCIATION,

    Defendant.

_____/

**CV 16-0493 TUCDCB**

## PLAINTIFF'S COMPLAINT

PLAINTIFF DEMANDS TRIAL BY JURY

Andrea B. Twitchell
Mailing Address:
2384 W. Via Di Silvio
Tucson, AZ  84741
(817) 938-5220

## COMPLAINT

COMES NOW, Plaintiff, Andrea B. Twitchell, and hereby files her Complaint against the Defendant, ALLIED PILOTS ASSOCIATION, and says:

### I.   JURISDICTION AND VENUE

1.      Plaintiff Andrea B. Twitchell brings this action against defendant Allied Pilots Association (the "APA"). The suit is based upon defendant's breach of its duty of fair representation, under the Railway Labor Act ("RLA"), 45 U.S.C. § 151 (1976) *et seq*, (LMRDA) Civil Enforcement of Union Bill Of Rights, 29 U.S.C 411-412.

### II.   PARTIES

2.      Plaintiff Andrea B. Twitchell ("Twitchell"), is a citizen of the United States, who resides in the State of Arizona.  At all times relevant, Twitchell was and is a member in good standing of the Allied Pilots Association, and a pilot who is covered under the Collective Bargaining Agreement ("CBA") between American Airlines, Inc. ("American" or "AA" or "the Company"), and the Allied Pilots Association.

3.      Defendant Allied Pilots Association ("APA" or "Defendant") is a labor organization and is the largest independent pilots union in the United States. APA is the exclusive representative of the 15,000 pilot employees of American Airlines and is headquartered in Ft. Worth, Texas.  APA is entitled to act for, and negotiate, collective bargaining agreements covering all pilots in the bargaining unit.

### III.   INTRODUCTION

4.      Twitchell brings this action against the APA for the Defendant's Breach of its Duty of Fair Representation owed to her in relation to the APA Equity Distribution Allocation and Award and for violations of (LMRDA) Civil Enforcement Of Union Bill Of Rights, 29 U.S.C. 411-412.

5.      After filing bankruptcy, American gave American Airlines pilots a 13.5% "Equity Stake" in the post-bankruptcy American Airlines that was estimated by APA to be worth approximately 1.2 billion dollars.  American permitted the APA to distribute the equity shares among its pilots conditional upon

the APA's indemnification of American for any legal challenges brought by any pilot or group of pilots relating to equity distribution.  Currently, there is a set aside for such legal challenges.

6.      This action is based upon the APA's arbitrary, discriminatory and bad faith treatment of Plaintiff in the APA Equity Distribution.  The APA Equity Distribution Eligibility and Allocation Award published in November 2013 treated Plaintiff less favorably than other similarly situated pilots. The APA actions have and will continue to have a disparate impact on Plaintiff in comparison to other American Airlines pilots.  Other similarly situated pilots were awarded equity shares worth an estimated $130,000 to $160,000.  Plaintiff was awarded a much smaller number of shares with an estimated value of $31,000.

## IV.  STATEMENT OF FACTS

### Employment History

7.      In or around June 1989, Twitchell bagan working as a pilot for American Airlines.

8.      On a date uncertain, but shortly thereafter, I became a member of APA and  remained, and still remain, a member in good standing.

9.      In or around June 2002, Twitchell became medically disqualified from flying.

10.      In or around February 2008, Twitchell was removed from the Seniority List.

11.      In or around January 2012, Plaintiff became medically qualified to fly.

12.      APA, by letter dated January 30, 2012 to American, confirmed their desire to restore Plaintiff's seniority and return her to flying status.

13.      American, by letter dated February 14, 2012, denied the request. Citing the company's plans to furlough pilots American wrote ". . . ,we are not prepared to authorize Ms. Twitchell's reinstatement to the pilot seniority list *at this time*." (*emphasis added*)

14.      On May 22, 2012, APA filed the Dallas Base Grievance (12-012), with Twitchell as the affected pilot, ". . . protesting the Company's violation of Sections 11.D, Supplement F(1), and . . .  as well as past practice, for failing to reinstate pilots to the Pilots' Seniority System List and for failing to provide pilots notice of  termination prior to terminating employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five years."

15.     Sometime in late 2012 (Oct-Nov-Dec) Twitchell received a phone call from J. Bennett Boggess ("Boggess"), APA's Director of Representation (Legal), informing her of the pending new 2013 Collective Bargaining Agreement ("CBA"). Boggess said that only "a very short number" of the then-pending grievances was being preserved after the 2013 CBA became effective. Boggess advised Twitchell that the Dallas grievance, of which she was the affected pilot, was ***not*** being preserved, but would be extinguished when the 2013 CBA became effective on January 1, 2013.

16.     On or around ***Febuary 1, 2016*** Twitchell learned that the Dallas grievance was ***not*** extinguished with the 2013 CBA, but rather had *been preserved* and was still open.

17.     **Mr. Boggess' statement was false.**

18.     This false statement by Mr. Boggess was **only the first misrepresentation** he would make regarding the Dallas Grievance (12-012).

19.     APA knew that Twitchell was seeking to return to work, to be reinstated to the seniority list, and to be returned to active status. APA knew that Twitchell had a grievance pending protesting the Company's failure to reinstate her to the seniority list and the Company's failure to follow past practice.

### American Airlines Bankruptcy

20.     AMR Corp. (parent company of American Airlines) filed for bankruptcy on November 29, 2011. Thereafter American and APA negotiated a new CBA that included APA receiving, for the benefit of its individual member pilots, 13.5% of the total equity of the new post-bankruptcy American. With the U.S. Bankruptcy Judge's approval of the new CBA APA secured the 13.5% equity stake in the reorganized airline.

21.     APA estimated this "Equity Stake" to be worth approximately 1.2 billion dollars.

22.     APA, the certified collective bargaining representative, under the Railway Labor Act, for American Airlines pilots, filed a Proof of Claim #8331 on July 13, 2012 against the debtor American Airlines for claims related to grievances involving APA and/or its member pilots that rise from conduct or breaches of the 2003-2008 CBA (including the supplemental Agreements) and other separate agreements between American and the APA.

[4]

23.     The Dallas Base grievance 12-012, with Twitchell as the affected pilot, was included in the Proof of Claim and had an attached value of $245,000.00.

### American-APA Letter of Agreement

24.     With the new CBA at hand, on November 16, 2012, APA and American entered into a Letter of Agreement (Settlement Consideration and Bankruptcy Protection) providing for, among other things, the settlement of claims of APA, on behalf of itself or the pilots represented by the APA, against American.

25.     The Agreement, which was incorporated into the new Collective Bargaining Agreement, excluded all pending grievances with the exception of the most serious grievances, which were specifically listed in Exhibit 1 of the letter.

26.     The Dallas grievance (12-012), with Twitchell as the affected pilot, was one of the named grievances listed in Exhibit 1 of the letter and was thereby incorporated by settlement into the new Collective Bargaining Agreement.

27.     The Dallas grievance (12-012)was *not* extinguished with the 2013 CBA, but rather had *been preserved*.

28.     As of December 11, 2015 Plaintiff's Grievance (12-012) was still open and pending.

29.     The Dallas Grievance (12-012), with Twitchell as the affected pilot, is still open as of this writing.

### Equity Distribution and APA Internal Measures

30.     In anticipation of receiving the equity interest estimated to be worth as much as $1.2 billion dollars, the APA established an Equity Distribution Committee charged with making recommendations on the division and distribution of the equity interest to the individual pilots.

31.     On February 5, 2013, the APA advised the Company, that the APA had devised an internal policy, that it will use in determining how it will allocate the funds it obtained as un unsecured claim as part of the Collective Bargaining Agreement reached during the Bankruptcy Proceedings.

32.     The parties agreed that any dispute about the distribution of the unsecured claim, including disputes over the APA's methodology for allocating such funds, the factors used to determine

the allocation of funds, or regarding the amount allocated to any pilot shall be subject to the APA's Lump Sum Resolution Procedure ("Procedure") which is contained in a provision in the APA Constitution and Bylaws ("C & B") and shall not constitute a grievance or other forms of resolution under the Collective Bargaining Agreement.

33. The APA Constitution and Bylaws state as follows:

> *In the event that the Association has discretion to distribute a lump sum payment ("Lump Sum Payment"), which shall be defined by the Board in the Lump Sum Dispute Resolution Procedure, any pilot or group of pilots who wishes to challenge the distribution shall be required to exhaust the Lump Sum Dispute Resolution Procedure. No pilot or group of pilots may take legal action against the Association with respect to any matter unless this particular Procedure has been invoked and exhausted by the pilot or group of pilots. (11/28/2012).*

34. A Dispute Resolution Procedure ("DRP") requirement to exhaust the dispute resolution procedure states as follows:

> *"No pilot or group of pilots may take legal action against the Association with respect to any Lump Sum Payment unless the Procedure has been invoked and exhausted by the pilot or group of pilots.*

35. APA issued the Equity Distribution APA Board of Directors-Approved Eligibility and Allocation document dated April 3, 2013, memorializing the final decision that the APA Board of Directors ("BOD") made concerning the APA equity distribution, including silo structure and allocation, eligibility criteria, methodology and the Dispute Resolution Procedure ("DRP").

36. The APA Board of Directors-Approved Eligibility and Allocation decision dictated APA's Legal Responsibilities as follows: (1) APA BOD must fairly represent all pilots who are subject to the provisions of the CBA; and (2) The distribution methodology must be non-arbitrary, non-discriminatory, and made in good faith.

37. The APA Board of Directors-Approved Eligibility and Allocation decision provided an eligibility protocol establishing a Supplemental Eligibility Qualification period ("SQP") guarantying that a pilot who met the eligibility requirements on either the Initial Eligibility Determination Date of January 1, 2013 or the Final Eligibility Determination Date will be eligible for the equity distribution.

38. A flow chart incorporating the criteria was contained in the BOD approved document.

39.     *Terminated Awaiting Grievance* is clearly and unambiguously defined in the final Equity

Distribution APA Board of Directors-Approved Eligibility and Allocation document dated April 3, 2013

as follows:

>    *"A pilot who has been terminated by the company as of January 1, 2013 but has*
>    *not yet completed the grievance process <u>will</u> be considered an "active" pilot for*
>    *this distribution."*

40.     Pursuant to the published *Terminated Awaiting Grievance* criteria for "special status"

situations a pilot who has been terminated by the Company as of January 1, 2013 but has not completed

the grievance process will be considered an active pilot for the distribution. (*emphasis added*).

41.     The APA Board of Directors made a policy decision to treat pilots *Terminated Awaiting*

*Grievance* as active pilots for the purpose of the equity distribution.

42.     Appendix C, to the Equity Distribution document clearly shows that Active pilots,

for the purposes of the distribution, are entitled to full eligibility.

43.     Full eligibility means that the pilot is eligible for a distribution from all (4) silos of the

Equity Distribution.

44.     Understanding the significant legal risks and potential for legal action, the APA,

maintained jurisdiction and maintained the right to amend and modify the arbitrator's final distribution

decision.

45.     The APA created an internal Error and Omissions claim process to review disputes.

Payments have been held in a secure account or trust for an appropriate period pending legal

determination.

46.     Based on the foregoing, it cannot reasonably be construed that the arbitrator's decision

was final and binding.

47.     The APA Equity Distribution, APA Board of Directors-Approved Eligibility and

Allocation document dated April 3, 2013 memorialized and finalized the decisions that the APA Board

of Directors (BOD) made concerning the equity distribution, including silo structure, allocation and

eligibility criteria.

## APA Equity Dispute Arbitration

48.     A large number of pilots contested the APA Equity eligibility criteria and subsequent distributions. APA Equity Dispute arbitration proceedings ("Proceedings") were held with Stephen Goldberg serving as the Arbitrator.

49.     Arbitrator Goldberg was selected solely by the APA, was paid by the APA, and has served as arbitrator in APA related matters on numerous previous occasions.

50.     The arbitration Proceedings did not adhere to the requirements of a Railway Labor Act arbitration procedure.

51.     J. Bennett Boggess, APA's Director of Representation (Legal),  submitted to the Proceedings a Declaration dated July 19, 2013.

52.     In the Declaration Boggess discussed, *inter alia*, APA's use of three-letter codes and the definition of TAG.

53.     APA uses a series of three-letter codes to reflect each pilot's APA status at any given time. The status codes were designed to capture the key aspects of a pilot's status with one three-letter code.

54.     Pertinent here are the codes MDD and TAG.

55.     MDD is "Medical Disability Dropped from AA" and is used for pilots who have been on unpaid sick leave, long-term disability, or a combination of both for more than five years and have been removed from the seniority list.

56.     TAG is Terminated Awaiting Grievance as defined above (¶ 39), and repeated here: *Terminated Awaiting Grievance* is clearly and unambiguously defined in the final Equity Distribution APA Board of Directors-Approved Eligibility and Allocation document dated April 3, 2013 as follows:

> *"A pilot who has been terminated by the company as of January 1, 2013 but has not yet completed the grievance process will be considered an "active" pilot for this distribution."*

57.     The APA Board of Directors-Approved definition of TAG does *not* require a pilot to be terminated *for cause*.

58.     In the July 19, 2013 Declaration Boggess stated, *inter alia*, ". . . TAG, is APA's code for pilots who (1) have been terminated *for cause* as a result of the disciplinary process . . ." (*emphasis added*) and APA argued for this position throughout the Equity Dispute Resolution Proceedings.

59.     During the arbitration Proceedings APA advised the arbitrator that although TAG pilots were terminated, the rationale for considering them "active" and awarding them a full four-silo distribution was that due to APA's advocacy for these pilots' reinstatement to active status a substantial number of pilots on TAG have been reinstated.

60.     APA ignored the fact that they are also advocating for non-TAG pilots who have grievances pending seeking reinstatement to the seniority list.

61.     It was APA's position that MDD pilots who have been removed from the seniority list should not participate in the equity distribution.

62.     APA did not notify pilots who had been removed from the seniority list of the arbitration Proceedings depriving them of the opportunity to submit a challenge to the Equity eligibility criteria and subsequent distributions.

63.     Twitchell was not notified of the arbitration Proceedings.

64.     Only a few MDD pilots, who learned of the Proceedings by happenstance, filed challenges in the Equity Distribution Proceedings. Like TAG pilots, these MDD pilots were awaiting grievance outcomes. APA argued against their participating in the equity distribution.

65.     APA argued that these pilots are not TAG pilots and should not be treated like TAG pilots who were presumed would be successful in the outcome of their grievances and reinstated to the seniority list.

66.     The arbitrator disagreed. The arbitrator held "that it *is arbitrary* for APA to treat pilots who have a pending TAG grievance as sufficiently likely to be successful that they will be treated, for purposes of Equity Fund eligibility, as if they will be successful, while treating differently pilots who have a pending non-TAG grievance that challenges an administrative termination." (*emphasis added*)

67.     The arbitrator held that pilots with grievances pending should be treated, at least for Equity Fund purposes, as if their grievances would be successful.

68.     A successful grievance outcome would have placed Twitchell on the seniority list thus entitling her to a full four-silo equity distribution.

69.     Initially, the APA did not notify Twitchell about the APA Equity Distribution, that she had been excluded, or that there was an arbitration Proceeding in which pilots were able to challenge the APA awards.  Twitchell learned about it only *after the fact*, when she received a phone call from Mark Myers ("Myers"), APA attorney, who informed her that because of the successful outcome of similarly situated pilots in the arbitration Proceedings, her award of zero was changed to an award of two silos.

70.     In awarding Twitchell only a two-silo equity distribution, APA *totally ignored* the fact that Twitchell was the named affected pilot in the Dallas grievance (12-012) seeking reinstatement to the seniority list.

### Aberrations at the Arbitration Proceedings

71.     APA successfully executed several aberrations at the arbitration Proceedings:

- APA changed the definition of TAG pilots and was successful in persuading the arbitrator of the new definition.  In the Boggess Declaration dated July 19, 2013 and submitted in the arbitration proceedings, Boggess stated, *inter alia*, ". . . TAG, is APA's code for pilots who (1) have been terminated *for cause* as a result of the disciplinary process . . ." (*emphasis added*)

   That this is false is clear when comparing it to the published definition from the APA BOD in the Equity Distribution APA Board of Directors-Approved Eligibility and Allocation document dated April 3, 2013 and quoted above.

- Boggess was further intentionally deceptive by stating in the Declaration, that "The grievance is not seeking to reinstate *all* pilots who have dropped off the seniority list by function of Section 11 or Supplement F simply because they dropped off the seniority list." (*emphasis added*)

   "The grievance is not seeking to reinstate *all* pilots who have dropped off the seniority list . . . simply because they dropped off the seniority list" *(italics added)* does not mean that the grievance does not seek to reinstate *a* or *any* pilots to the seniority list. Boggess intentionally did not  disclose that there *was* a pilot seeking reinstatement to the seniority list – Plaintiff, who was the affected pilot for whom the Dallas grievance was written.

[10]

- Boggess was successful in deceiving the arbitrator about the purpose of the grievance. That the purpose of the grievance was unclear to the Arbitrator is evidenced by Arbitrator's own words in the Decision and Award.

  The Arbitrator wrote, "On its face, the DFW Domicile Grievance *is unclear* as to what relief will be available if the Union prevails. But according to APA's Director of Representation,  J. Bennett Boggess, the purpose of the grievance was solely to improve procedures going forward, *not to secure the reinstatement of **any** pilot*." (*Italics and **bold** added*)

  This Boggess representation to the Arbitrator is false.

- APA and Boggess sneakily submitted the Declaration during the Proceedings *after* many pilots had already given their arguments. In addition, Boggess did not make himself available for questioning or cross examination. This ensured that the arbitrator did not hear any contradictory testimony.

- APA intentionally withheld the existence of the LGA Base grievance 11-054 which protested the company's violation of the CBA and past practice, and failure to provide pilots notice of termination prior to terminating employment status of pilots who have been on inactive status, unpaid sick, or disability for more than five years.

- APA crafted the false argument that when an MDD pilot is taken off the seniority list after having been on unpaid sick leave, long-term disability, or a combination of both for five years – said pilot is terminated from the company. Boggess makes this assertion in his Declaration and elsewhere and claims it is pursuant to Section 11.D. and Supplement F(1) of the CBA. This is false. See next section.

### Removal from the Seniority List vs. Termination

72.   APA argues that when a pilot is removed from the seniority list at five years said pilot is terminated from American in accordance with Section 11.D and Supplement F(1) of the CBA. *This is false.*

73.   Section 11, in its entirety, addresses Leaves of Absence. Section 11.D addresses leaves based on sickness or injury. Specifically, 11.D states that a pilot on leave of absence based on sickness or injury shall *retain and continue to accrue* seniority for a maximum of five years.

      Section 11.D does not address termination from American at five years or at any time.

74.   Supplement F(1) is a letter of agreement between American and APA. The letter declares its purpose in the opening sentence: "The Company has made and will make the following revisions to the Pilot Retirement Benefit Plan." The document concerns itself with (1) the calculation of pilots' retirement benefits under a variety of circumstances

(including those receiving disability benefits), and (2) life insurance issues under a variety of circumstances.

Supplement F(1) does not deal with termination from American.

## ARGUMENTS

### Twitchell Met The Special Eligibility Criteria Terminated Awaiting Grievance

75.    Twitchell met the eligibility requirements established by the Board of Directors on both the Initial Eligibility Determination Date of January 1, 2013 and the Final Eligibility Determination Date and was entitled to be treated as fully eligible.

76.    Twitchell met the Special Status Eligibility Criteria for a pilot *Terminated Awaiting Grievance*.

77.    The flow chart incorporated in the BOD approved document indicates that Twitchell is *"fully eligible"* for all four silos from the APA Equity Distribution.

78.    Plaintiff's termination was improper under the terms of the pilot's CBA and it is reasonable to presume that Twitchell would prevail on her grievance.

79.    Twitchell's grievance challenging her employment status seeks to return Twitchell to the Pilots' Seniority System List in accordance with the CBA ". . . Sections 11.D, Supplement F(1), and all other related sections of the Agreement as well as past practice, . . ."

80.    Pursuant to the published *Terminated Awaiting Grievance* criteria for "special status" situation  pilots who have been terminated by the Company as of January 1, 2013 but have not completed the grievance process will be considered *active* pilots for the distribution. (*emphasis added*).

81.    Twitchell was wrongfully terminated by the Company in February 2008. APA initiated a grievance (12-012) on her behalf on May 22, 2012 seeking to return her to the seniority list.  The grievance has not been completed. Thus, pursuant to the *Terminated Awaiting Grievance* criteria for "special status" situation pilots Twitchell should have been considered an *active* pilot for the equity distribution.

82.    Appendix C to the Equity Distribution document clearly shows that *active* pilots, for the purposes of the distribution, are entitled to *full eligibility*.

[12]

83. Full eligibility means that pilots are eligible for all four silos of the equity distribution.

84. Twitchell was eligible for a distribution from all four (4) silos of the equity distribution.

**Twitchell Had A Non-TAG Grievance Pending**

85. Although the APA Board of Directors-Approved Eligibility and Allocation document dated April 3, 2013 <u>did not</u> define Terminated Awaiting Grievance pilots as pilots who were terminated *for cause*, Arbitrator Goldberg in the Proceedings accepted APA's argument that TAG pilots were pilots terminated for cause and excluded pilots who were terminated subsequent to removal from the seniority list (administrative termination).

86. The arbitrator also accepted APA's argument that TAG pilots should be treated as active for the equity distribution because APA was sufficiently likely to prevail in the grievance and succeed in restoring TAG pilots to the seniority list.

87. Having accepted both APA's modified definition of TAG pilots and their argument that they were likely to prevail in the outcome sought in the grievance (reinstatement to the seniority list), the arbitrator questioned if it was arbitrary for APA to treat pilots with pending TAG grievances seeking reinstatement to the seniority list differently from pilots who have pending non-TAG grievances seeking reinstatement to the seniority list.

88. The arbitrator held that *it was arbitrary* for APA to treat pilots with pending TAG grievances seeking reinstatement to the seniority list differently from pilots who have pending non-TAG grievances seeking reinstatement to the seniority list.

89. Thus, the arbitrator held that pilots who have pending non-TAG grievances seeking reinstatement to the seniority list are entitled, for equity distribution purposes, to the same presumption of success in the outcome of their grievances that TAG pilots were receiving.

90. Twitchell had a grievance (12-012) seeking reinstatement to the seniority list.

91. APA's modified definition of TAG pilots converted Twitchell's grievance (12-012) to a non-TAG grievance seeking reinstatement to the seniority list and entitled her, for equity distribution purposes, to the same presumption of success in the outcome of her grievance that TAG pilots were receiving.

92.    Accordingly, Twitchell should have been presumed to be successful in her reinstatement to the seniority list and should have received a full four-silo equity distribution.

### APA's Abrogation of Duty of Fair Representation

93.    The APA Board of Directors made a policy decision to treat pilots *Terminated Awaiting Grievance* as active pilots for the purpose of the equity distribution.

94.    However, without the Board of Directors having amended the Equity Distribution eligibility criteria in any way and after the dispute proceedings began, APA Representatives argued the eligibility criteria meant only those pilots terminated "for cause" (testing positive for alcohol or drugs, felony convictions, etc.) that were awaiting grievance. APA sought to exclude medically disabled pilots who had been wrongfully terminated "without cause" and were awaiting grievance from obtaining any, much less a full, equity share. (These wrongful terminations were in violation of the CBA)

95.    In the Proceedings APA *intentionally misled* the arbitrator about the Dallas grievance (12-012), and Plaintiff's seeking reinstatement to the seniority list, stating that the grievance was "… not to secure the reinstatement of any pilot."

96.    There were thirteen pilots, besides Plaintiff, that had been terminated by the Company as of January 1, 2013 that had not yet completed the company grievance process.

97.    Unlike Twitchell and one other, these pilots were afforded the presumption that they would prevail on their grievance because APA was advocating for them.  They were all given 4 silos from the Equity Distribution.

98.    The APA misrepresented the grievance that they themselves had prepared.  Subsequently, they reduced Plaintiff's equity stake in the new American Airlines by approximately $100,000.00.

99.    Twelve of those thirteen pilots, were made fully eligible for the Equity Distribution. Those pilots, including one or more terminated *without cause*, were awarded all four silos valued at approximately $130,000.00-$160,000.00

100.    Plaintiff was granted only two silos out of four, for a total of approximately $30,000.00, a difference in excess of $100,000.00.

[14]

101.   In regard to Equity Distribution, the APA BOD had a legal responsibility to represent all of its pilot members and to ensure that the distribution was fair and reasonable, non-arbitrary, non-discriminatory, and made in good faith.  The APA's actions toward Plaintiff and MDD disabled pilots wrongfully terminated after removal from the seniority list were more than mere negligence and fell outside of a wide range of reasonableness.  As seen below, APA's discrimination towards Plaintiff and other MDD disabled pilots removed from the seniority list was invidious and unrelated to any legitimate objective under Federal Labor law.

102.   The APA not only failed in their legal responsibility to fairly represent Plaintiff and other MDD disabled pilots with regard to the APA Equity Distribution, they actively sabotaged the efforts of MDD disabled pilots attempting to receive their fair allocation of the Equity Distribution funds.

103.   In an effort to defeat a fair allocation of the APA Equity Distribution funds to Plaintiff and MDD disabled pilots, the APA:

(a) Intentionally misinformed Plaintiff that the Dallas grievance (12-012) with her as the affected pilot was being extinguished with the CBA that became effective January 1, 2013. Boggess intentionally made this false representation to Plaintiff.

(b) Argued they had no duty of representation to MDD disabled pilots or MDD pilots with a history of disability;

(c) For the Proceedings rewrote the definition of a pilot Terminated Awaiting Grievance;

(d) Falsely argues that termination from American upon removal from the seniority list at five years is in accordance with Section 11.D and Supplement (F)1 of the CBA.

(e) Reinterpreted and misrepresented the CBA Sections 11.D and Supplement F(1) claiming that removal from the seniority list means termination from the Company in direct contradiction of the Dallas grievance (12-012) which they wrote and in which they protested "…the Company's violation of Sections 11.D, Supplement F(1), and all other related sections of the Agreement … for failing to reinstate pilots to the Pilots' Seniority System List….";

(f) Reinterpreted and misrepresented the CBA Sections 11.D and Supplement F(1) claiming that removal from the seniority list means termination from the Company in direct contradiction of the Dallas grievance (12-012) which they wrote and in which they protested violation of past practice;

(g) Argued in bad faith that MDD disabled pilots seeking reinstatement to the seniority list should not be treated as terminated awaiting grievance because removal from the seniority list is not termination *for cause*;

(h) Failed in their duty of candor to the arbitrator;

(i) In the arbitration Proceedings intentionally submitted a false Declaration that misrepresented the purpose of the Dallas grievance;

(j) In the arbitration Proceedings intentionally misled the arbitrator about the purpose of Dallas grievance (12-012);

(k) In the arbitration Proceedings intentionally withheld from the arbitrator the existence of the New York grievance (11-054);

(l) Intentionally ignored Plaintiff's Dallas grievance (12-012) when awarding her two silos instead of the four silos the arbitrators Decision awarded her by virtue of the Dallas grievance, resulting in an underpayment of approximately $100,000.00.

(m) Knowingly took a position inconsistent with and in contradiction to MDD disabled pilot Kathy Emery's ("EMERY") pending grievance (07-082);

(n) Knowingly took a position inconsistent with and in contradiction to APA President Lloyd Hill's submission of Emery's grievance (07-082) to the 5 member System Board of Adjustment;

(o) Falsely claimed that Emery's grievance (07-082) does not seek her reinstatement as an active employee of American;

(p) Treated Plaintiff and MDD disabled pilots less favorably than other similarly situated pilots;

(q) Treated Plaintiff and MDD disabled pilots who were wrongfully terminated, without cause, less favorably than pilots terminated for cause (i.e., insubordination, felony convictions, testing positive for alcohol or drugs, abuse of company benefits, etc...);

(r) Unreasonably assumed that Twitchell, who was terminated without cause awaiting grievance, (inactive) more than 5 years, was unlikely to return to active flying, even though they had written a grievance (12-012) seeking to restore her to active duty and reinstate her to the seniority list -- and this while assuming pilots terminated *for cause*, awaiting grievance, (inactive) more than 5 years, are likely to return to active flying;

(s) Failed to afford Plaintiff the benefit of presumptions afforded other pilots "that they would prevail on their grievance," and totally ignored the grievance written on plaintiff's behalf (12-012);

(t) Stated under oath that TAG pilot status is given to only "active" pilots who have been terminated by the company" while failing to disclose that TAG pilot status was also given to inactive pilots who have been terminated by the company, including pilots unable to hold a FAA First Class Medical.

(u) Unreasonably argued that allowing MDD disabled pilots to participate in the equity distribution served as "a dilution factor" that would reduce the amounts awarded to other pilots, including those terminated *for cause*.

(v) Testified under oath, regarding the Dallas grievance (12-012) with Plaintiff as the affected pilot, that "... nor has any one pilot been presented as – as the – the representative pilot."

104.   The APA is not only abrogating their legal responsibility to fairly represent Plaintiff and other MDD disabled pilots with regard to the APA Equity Distribution, they are actively engaged in a campaign of dishonesty and deceit with the goal of sabotaging MDD disabled pilots attempting to receive their allocation of the Equity Distribution funds as awarded in the arbitrator's Decision and Award.

### Additional Points

105.   The parties did not agree that the APA Equity Dispute Resolution Proceedings, conducted in violation of the Railway Labor Act, were final and binding.

106.   Subsequent to the APA Equity Distribution, disabled pilots were speaking openly about APA's treatment of disabled pilots.

107.   APA classifies Twitchell's member status as MDD.  MDD is an internal APA code that is defined by APA as "Medical Disability Dropped from AA."

108.   APA documents define MDD pilots as members in good standing.

109.   APA is a labor organization as defined under the Labor-Management Reporting and Disclosure Act of 1959, as amended ("LMRDA"), 29 U.S.C. 402.

110.   Without explanation or notice, on April 22, 2014 the Allied Pilots Association, the collective bargaining agent for *all* American Airlines pilots, locked out Plaintiff and 233 other pilots from the Challenge and Response ("C&R") section of the APA website after a number of disabled and formerly disabled pilots began to complain about disparate treatment by the APA on the basis of disability.

111.   C&R is a pilot discussion forum that is the equivalent of a virtual union hall.

112.   The 233 pilots locked out of C&R are believed to be pilots classified by the APA as "MDD" or Medical Disability Dropped from AA.  This policy has been and is the subject of an ongoing dispute between the APA, AA and its disabled pilots.

113.   Many pilots have insisted the APA grieve the policy on the grounds that it violates the Collective Bargaining Agreement. Currently there are several Company grievances and arbitrations pending related to this issue filed by the APA.  They now appear to have been stymied.

114.   Historically APA has classified "MDD's" as members in good standing and as members in good standing they have always been granted access to Challenge and Response. Now Twitchell and others have been prevented from entering APA's virtual union hall after openly challenging the APA's treatment of disabled pilots on Challenge and Response.

## VI.   CAUSE OF ACTION

### COUNT I: BREACH OF THE DUTY OF FAIR REPRESENTATION IN VIOLATION OF THE RAILWAY LABOR ACT/ BREACH OF FIDUCAIRY DUTY

115.   Plaintiff incorporates the allegations contained in the Paragraphs above as if fully stated herein and says further that:

116.   The failure of the Defendants to allocate in good faith the proceeds of the APA Board of Directors approved Equity Distribution to Plaintiff is a breach of the APA's duty to fairly represent Andrea Twitchell.

117.   The effect of Defendants' failure to fairly represent in the allocation of the same payment of compensation and benefits as is enjoyed by similarly-situated pilot members of the APA is in violation of the Railway Labor Act ("RLA")

118.   The Equity Distribution Decision and Award dated October 15, 2013 determined that Twitchell should receive payments from the APA Equity Distribution that other similarly situated pilots received.

119.   But for the arbitrary, discriminatory and deliberate, bad faith actions of the APA, Twitchell would have enjoyed the same payment of benefit as is enjoyed by active members and similarly-situated pilot members of the APA.

120.   Bad faith acts perpetrated by APA in the application of the arbitrator's Decision and Award have resulted in an estimated loss to Twitchell of approximately $100,000.00 as compared to other similarly situated pilots.

### COUNT II: LABOR MANAGEMENT REPORTING AND DISCLOSURE ACT (LMRDA) CIVIL ENFORCEMENT OF UNION MEMBER BILL OF RIGHTS, 29 U.S.C. 411-412

121.   Plaintiff incorporates the allegations contained in the Paragraphs above as if fully stated herein and says further that:

122.   Title I of the LMRDA; Bill of Rights of Members of Labor Organizations, 29 U.S.C., 411, SEC. 101; provides among other things that every member of a labor organization shall have equal

rights and privileges to participate in union activities, freedom of speech and assembly in the union hall and protection of the right to sue.

123.    Title I of the LMRDA;  Bill of Rights of Members of Labor Organizations, 29 U.S.C. 412, SEC. 102. Civil Enforcement; provides, any person whose rights secured by the provisions of this title have been infringed by any violation of this title may bring a civil action in a district court of the United States for such relief, (including injunctions) as may be appropriate.

124.    Accordingly, Plaintiff respectfully requests that this Court grant her injunctive relief prohibiting the APA from denying her and other similarly situated pilots from full access to the APA website, particularly the Challenge and Response ("C&R") discussion forum and prohibiting the APA from denying her from full access to APA union hall meetings.     Additionally, Plaintiff seeks the opportunity to participate in these forums without fear of threats, intimidation or retaliation.

## VII.   PRAYER FOR RELIEF

**WHEREFORE,** Twitchell respectfully requests that the Court enter judgment in her favor against the Allied Pilots Association for damages resulting from the breach of duty of fair representation, consisting of, among other things, granting her the equivalent market value of the AA compensation (equity distribution dollar value) she has lost due to the discriminatory, arbitrary and bad faith actions of the APA; modify and amend the APA allocation and award, require the APA to make Twitchell whole; and cost of suit.

Plaintiff respectfully requests the court award punitive damages under Count II: Labor Management Reporting and Disclosure Act (LMDRA) Civil Enforcement of Union Member Bill of Rights, 29 U.S.C. 411 Section 101 and 412 Sec 102.

Additionally Plaintiff prays this Court will grant Plaintiff's request for injunctive relief and award such further relief as the Court deems just and proper.

Respectfully submitted this 26th day of July 2016.


Andrea B. Twitchell
Mailing Address
2384 W. Via Di Silvio
Tucson, AZ  84741
(817) 938-5220